RICHARD QUATTLEBAUM V. THE BOEING COMPANY
C/A No. 2:14-cv-03664-DCN-MGB

**DEFENDANT'S MOTION AND MEMORANDUM IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT "A"

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF SOUTH CAROLINA
 2                 COUNTY OF CHARLESTON

 3    RICHARD QUATTLEBAUM,

 4         Plaintiff,

 5         vs.              CASE NO. 2:14-cv-3664-DCN-MGB

 6    THE BOEING COMPANY,

 7         Defendant.

 8

 9    DEPOSITION OF:      RICHARD QUATTLEBAUM

10    DATE:              July 8, 2015

11    TIME:              10:54 AM

12    LOCATION:          Nexsen Pruet, LLC
                         205 King Street, Suite 400
13                       Charleston, SC

14    TAKEN BY:          Counsel for the Defendant

15    REPORTED BY:       MARIE H. BRUEGGER, Registered
                         Professional Reporter, CRR
16    _____

17

18

19

20

21        A. WILLIAM ROBERTS, JR., & ASSOCIATES

22            Fast, Accurate & Friendly

23    Charleston, SC    Hilton Head, SC   Myrtle Beach, SC
      (843)722-8414     (843)785-3263     (843)839-3376
24
      Columbia, SC      Greenville, SC    Charlotte, NC
25    (803)731-5224     (864)234-7030     (704)573-3919
```

22

```
1    company processes and systems, correct?

2         A.    Yeah.

3         Q.    So you knew that Force Protection took

4    the position that you were terminated?

5         A.    Yeah.

6         Q.    When you first went to work for

7    Boeing, what was your position?

8         A.    I was a Class -- I guess you could say

9    a Class A assembler.

10        Q.    Were you an A assembler the entire

11   time you were with Boeing?

12        A.    No.

13        Q.    When did that change?

14        A.    That changed -- well, after you finish

15   school, I think in about six months -- six months

16   to a year of service, I think, you become a B

17   mechanic.

18        Q.    And did you become a B mechanic?

19        A.    Yes.

20        Q.    And were you a B mechanic the

21   remainder of your employment with Boeing?

22        A.    Yes.

23        Q.    You said after school.  Is that an

24   internal Boeing school?

25        A.    Yes.
```

1          A.    The hours changed, but not the shift.

2          Q.    So you stayed on second shift the

3    entire time you were there?

4          A.    Yes.

5          Q.    Did your supervisor change?

6          A.    Yes.  They rotate every six months, or

7    something like that.

8          Q.    After Jackie Bauknight, who was your

9    next supervisor?

10         A.    What was it?  Catherine.  They called

11   her Cat.

12         Q.    Is that Cat Alford-Myers?

13         A.    Yes, that's who, yeah.

14         Q.    And how long do you recall did she

15   stay your supervisor?

16         A.    Well, when I -- when I went in -- when

17   I went on medical leave, Cat was my supervisor.

18         Q.    She was.  And that would have been

19   August of 2012?

20         A.    Yes.

21         Q.    So is it fair to say that Jackie

22   Bauknight and Catherine Alford-Myers were your

23   supervisors while you worked at Boeing?

24         A.    Yes.

25         Q.    Any other supervisors?

42

1       Q.    Was she voted out?

2       A.    I don't know.  I was out on medical

3   leave, and I never returned back to Boeing.

4       Q.    And I'm going to ask you just one more

5   time.  Can you think of anything else that she did

6   that you considered to be nit-picking and

7   harassment?

8       A.    I've got that in the back of my head.

9   I'm trying to think of some things now.

10      Q.    If you think of anything during your

11  deposition, stop and let me know what those are.

12      A.    Okay.

13      Q.    You went and talked to Catherine

14  Alford-Myers.  You talked to her supervisor, Art,

15  and what was Art's last name?

16      A.    Washington, I think.

17      Q.    Washington.  Who else did you talk to

18  about this?  You said you went to HR.

19      A.    Yes, Cojohna Rice.

20      Q.    Was she your HRG, your HR person?

21      A.    At the time, yes.

22      Q.    And what did you tell Cojohna Rice?

23      A.    That I was being harassed, and that I

24  didn't get any response out of Cat or Art

25  Washington, and that I was considering treatment

43

```
1   for anxiety, work-related stress.
2        Q.    You said you were considering it, or
3   you were -- what did you say about treatment and
4   anxiety, just then what you said?
5        A.    That I was going out to get treatment.
6        Q.    That you were going out to get
7   treatment, okay.  You told Cojohna Rice that?
8        A.    Yes.
9        Q.    What was her response?
10       A.    Her response was:  Great.  I'm
11  100 percent behind you, and I'll be here, you
12  know, to support and help you.
13       Q.    And did she actually send you over to
14  Resa Mason?
15       A.    Could have been vice versa.  I don't
16  know.  I think she did.  I think she did.  I'm
17  not -- I'm not sure how exactly that translated,
18  you know, but I was introduced to Cojohna -- I
19  mean to Resa Mason, and she was, you know, an
20  evaluation for Boeing.
21       Q.    Do you know when you first talked with
22  her?
23       A.    I don't remember that.  I think I
24  remember the conversation, that I was at work, and
25  I was having an anxiety attack, and I called her,
```

44

1    and she got me to drive over to the Palmetto

2    Behavior Health Center.

3         Q.    So you were still at work when you

4    first talked to her?

5         A.    Yes.

6         Q.    Talked to Resa Mason?

7         A.    Yes.

8         Q.    And when you told her you were having

9    anxiety and all, what did you say to her?

10        A.    Quote?

11        Q.    Yeah.  What do you remember telling

12   her, what kind of anxiety?  Did you tell her what

13   the issue was?

14        A.    Yeah, I told her what the issue was.

15   She knew what the issue was.

16        Q.    So what did you tell her?

17        A.    I told her what the issue was.

18        Q.    Tell me what the issue was.

19        A.    I was being harassed and stressed out

20   on the job.

21        Q.    Did you tell her you were angry?

22        A.    Yes.

23        Q.    Did you tell her that you were having

24   thoughts of injuring or harming your lead?

25        A.    Yeah.

Quattlebaum, Richard v                                    Richard Quattlebaum
Boeing Company                                                  July 08, 2015

45

```
 1          Q.   Was that Joy?
 2          A.   Yes.
 3          Q.   And were you having those thoughts?
 4          A.   Yeah.   It went on for over a month,
 5   and, you know, you back a rat into a corner, he
 6   going to fight.
 7          Q.   When did you first have feelings of
 8   being concerned that you were going to harm or do
 9   something to Joy?
10          A.   Well, after it persist about three
11   weeks, and I didn't -- I couldn't get any response
12   from -- no help from either Cat or Art.
13          Q.   Did you ever take any action to harm
14   her, to do anything?
15          A.   No, no, no.
16          Q.   Did you consider taking action?
17          A.   It was a thought.
18          Q.   And tell me what -- explain to me what
19   that thought was.
20          A.   It was a thought.
21          Q.   That you would do what?
22          A.   Well, I would --
23          Q.   I mean, was there a specific, that you
24   would hit her or that you would -- what were you
25   concerned about doing?
```

Quattlebaum, Richard v                                    Richard Quattlebaum
Boeing Company                                                    July 08, 2015

46

```
 1          A.    No.   It was just basic anger.   You
 2   know, it could have been a thought of choking her
 3   or hitting her or something like that.   I mean, to
 4   be honest, it was very --
 5          Q.    Did you consider it to be serious?
 6          A.    Yes, I did.   That's why I got
 7   treatment.
 8          Q.    So you told Resa this, and Resa sent
 9   you to Palmetto Behavioral Health, correct?
10          A.    Right, yeah.
11          Q.    Did you talk with anyone else about
12   this at Boeing before going to Palmetto Behavioral
13   Center?
14          A.    No, no.
15          Q.    So it was Resa, you talked with
16   Cojohna?
17          A.    Yeah.
18          Q.    And you talked with your supervisor,
19   Catherine Alford-Myers?
20          A.    Yeah.   None of the -- none of the
21   employees, none of those, no.
22          Q.    Did you talk with anybody else
23   in-house at Boeing?
24          A.    No.
25          Q.    Was there any physician or anybody
```

Quattlebaum, Richard v                                    Richard Quattlebaum
Boeing Company                                                July 08, 2015

47

1    else other than Resa?

2         A.    No.

3         Q.    So when you went to Palmetto

4    Behavioral, who was your -- did you go into like a

5    six-week program?

6         A.    I think it was a six-week program.

7         Q.    And what did that program involve?

8         A.    It involves a lot of counseling and a

9    lot of stuff with self-esteem, you know, how to

10   deal with stress.

11        Q.    Was it a situation where you could

12   come and go, or did you stay there in that

13   program?

14        A.    It was a -- it was a situation where I

15   come and go.  I had to meet there every morning at

16   I think it was like 8:30, 9:00, something like

17   that, and spend all day.

18        Q.    I have in the records that your last

19   day of working was August 21st, 2012.  Does that

20   sound right?

21        A.    Yeah, that sounds about right.

22        Q.    So when you told Resa and told Cojohna

23   you needed to take some leave, did you then take

24   some action to apply for that lead?

25        A.    I contacted Aetna.

```
 1          Q.    You contacted Aetna.   Now, how did you
 2   contact Aetna?
 3          A.    Through a phone conversation, I mean.
 4          Q.    Are you familiar with Total Access?
 5          A.    Yeah.
 6          Q.    Did you go through Boeing's Total
 7   Access program to contact Aetna?
 8          A.    Yes.
 9          Q.    Explain to me what Total Access is.
10          A.    It ain't what it says, I'll tell you
11   that.   It's not really total access.   It's
12   supposed to be a link between you and Aetna and
13   FLMA (sic).
14          Q.    FMLA?
15          A.    Yeah.   That's supposed to be your
16   chain of command.
17          Q.    So you go into Total Access and put in
18   the lead dates that you need?
19          A.    Yes, and they sent -- they mailed me
20   the paperwork, and I get the paperwork to the
21   providers, and then the providers fill the
22   paperwork out, and I send it back to them.
23          Q.    And are you putting that paperwork in
24   through Total Access, or are you mailing it back?
25          A.    I'm mailing it back.
```

Quattlebaum, Richard v
Boeing Company

Richard Quattlebaum
July 08, 2015

49

1      Q.    You're mailing it back?

2      A.    Yeah, because I don't have a home

3   computer, so everything is really generated by

4   mail.

5      Q.    When you contact Aetna, how do you go

6   about doing that?  How do you know the number to

7   call at Aetna?

8      A.    Well, I go through the Total Access

9   number, and it's a mess.

10     Q.    To get in touch with Aetna?

11     A.    Yes.

12     Q.    Now, why do you say it was a mess?

13     A.    Because Aetna put you between your

14   provider, you, and Aetna.  Aetna gives me the

15   paperwork to give to the provider.  If the

16   provider don't understand the paperwork, he

17   contacted me, and I'm between -- you see where I'm

18   going with this?  I'm between the provider and

19   Aetna, and I got to translate -- because a lot of

20   times I ran into a problem where the doctor didn't

21   fill out the paperwork correctly, and he didn't

22   fill it out on time to get it back to them on

23   time, and it was a mess.

24     Q.    So you are responsible for getting

25   that paperwork back in?

Quattlebaum, Richard v                                    Richard Quattlebaum
Boeing Company                                                    July 08, 2015

50

1       A.   Yes, yes.  I got to like:  Doc, I need

2   this.  I need this.  I need this.  I need this,

3   Doc.  I'm going to lose my job.  I need this.  I

4   need this paperwork filled out today.  I got to

5   have it.  And he like got like other clients and

6   other things that he got to do, and he like trying

7   to -- it was a mess.

8       Q.   Aetna would give you certain deadlines

9   to have the information back in?

10      A.   Right, right, right.  And as soon as I

11  get them in the mail, I send them to the doctors,

12  tell the doctor:  Look, I got to get this back.

13  I've got to have this.

14      Q.   Because if you don't get it back on

15  time, you may be terminated?

16      A.   Yeah, yeah.  It's on me, you know, and

17  I'm stuck here saying:  I need this paperwork back

18  or I'm going to get terminated, but I can't make

19  these people do this.  I'm already in treatment.

20  I'm already in treatment for stress.  So, I mean,

21  the deadline's tomorrow, and he's still got the

22  paperwork.  Ain't nothing I can do.  It was a

23  mess.

24      Q.   Let me back up and ask you a question.

25  Did you receive any treatment for depression or

Quattlebaum, Richard v                              Richard Quattlebaum
Boeing Company                                            July 08, 2015

53

1   anywhere else, where you said:  I'm so angry, I

2   may hurt -- I'm having these feelings.  I may hurt

3   or harm this individual.

4          A.   To be all fairness and to answer your

5   questions, you get mad every day in life, and, you

6   know, I just -- you know, I just try to balance

7   it.

8          Q.   So I'm going to take that as a yes,

9   that you have, but you just try to balance it.

10         A.   Yeah.  You got to balance it, you

11  know.

12              (DFT. EXH. 5, 9/24/12 Treatment Record

13  of Dr. Burke [SBH_000006], was marked for

14  identification.)

15  BY MS. BLACKBURN:

16         Q.   Let me show you Defendant's Exhibit 5.

17              Now, you were treated by William

18  Burke, Dr. Burke, correct?

19         A.   Yes.

20         Q.   Was that when you came out of Palmetto

21  Behavioral?

22         A.   Yeah.  That's my -- that's my -- that

23  was like my out of treatment provider, and that

24  was a disaster.

25         Q.   Did Palmetto refer you to Dr. Burke?

Quattlebaum, Richard v                                    Richard Quattlebaum
Boeing Company                                                    July 08, 2015

54

```
 1        A.    Yes.
 2        Q.    And I believe Susan Crocker also in
 3   his office, correct?  Do you remember seeing her?
 4        A.    Who?
 5        Q.    Susan Crocker, Dr. Crocker.  Did you
 6   ever see her?
 7        A.    Yes, yes, yes, yes.  I remember
 8   Dr. Crocker, yes, yes.
 9        Q.    And you saw Dr. Burke several times,
10   right?
11        A.    Yes, yes.
12        Q.    I'm going to show you Defendant's
13   Exhibit 5, and these are some notes from his
14   office.  Why don't you look at the first three
15   paragraphs to start off with.  Have you read that?
16             That very first paragraph, where it
17   says that:  When asked what was the reason for his
18   referral, he stated:  I don't like talking about
19   it.  I feel like I've been the victim of
20   prejudice, but no one at Boeing will listen to me.
21   I admit that I had some bad thoughts, like any
22   animal that is cornered.  They said I was goofing
23   off on my job and leaving work.  I told my boss
24   that this little dyke is lying about me.
25             Do you recall saying that to him?
```

Quattlebaum, Richard v                              Richard Quattlebaum
Boeing Company                                             July 08, 2015

63

```
 1   we was trying very hard to get in contact with her
 2   to see what it would take for me to come back to
 3   work, because I'd need a medical clearance to come
 4   back to work.
 5          Q.   You did need a medical clearance to
 6   come back to work?
 7          A.   Yes.
 8          Q.   Now, during this time, were you also
 9   in touch with Aetna and getting the paperwork from
10   Aetna and sending paperwork to Aetna?
11          A.   All the paperwork that I got, I gave
12   it to Dr. Burke.  Somehow or another, it got
13   screwed up.  I got the blame for it because I'm
14   the victim.  I'm the lowest man on the totem pole.
15   I couldn't -- you know, like Dr. Burke said he
16   was -- he was like confused.  He said:  They keep
17   asking me -- he was complaining to me about the
18   paperwork that -- actually, Dr. Burke, he said:
19   They keep asking me the same thing over and over.
20   And I said:  Well, Doc -- he say Aetna -- you
21   know, it was crazy.
22               And I was stuck in between Dr. Burke
23   and Aetna, and somehow or another, it didn't add
24   up.  I mean, I got to the point where Dr. Resa
25   Mason was my only contact with Boeing.  Between
```

66

1    on the road for me to go back to work.

2                I spoke with Dr. Tillsman.

3        Q.    Tiechner?

4        A.    Yes, yes, yes.  I paid about $160 out

5    of my pocket to see this doctor.  He gave me an

6    evaluation test that took about an hour.  He

7    didn't understand why -- because I think where the

8    problem came in at, Dr. Resa Mason -- I think

9    where this came in at, Dr. Resa Mason, she was my

10   only, you know, direct contact from Boeing, and

11   she was in contact with my doctors, and she was --

12   I think where we got to this point, she was

13   like -- wanted a second opinion from Dr. Burke.

14       Q.    To the best of your recollection,

15   though, was Dr. Burke still recommending anger

16   management in November of 2012?

17       A.    Yes, yes.

18               (DFT. EXH. 9, 12/5/12 Letter to Resa

19   Mason from Dr. Crocker and Dr. Burke [SBH_000010],

20   was marked for identification.)

21   BY MS. BLACKBURN:

22       Q.    Let me show you Defendant's 9, which

23   is a letter from Dr. Burke and Dr. Crocker.  I'll

24   give you a minute to look at that letter.

25       A.    I think this Dr. Farrell, I think he

1  them, I told them that that was out of network,

2  when they sent me to that doctor, he was out of

3  network, and I had to pay for it out of my own

4  pocket.  You know, that hurt.

5          Q.   So that fitness for work evaluation

6  you did not have done?

7          A.   No.

8               (DFT. EXH. 10,  12/14/12 Clinician

9  Notes of Dr. Burke [SBH-000002], were marked for

10  identification.)

11  BY MS. BLACKBURN:

12          Q.   And then let me just show you the next

13  exhibit, which is Exhibit 10, some notes back from

14  Dr. Burke, and this, I think, says:  Patient

15  represented he went to Dr. Tiechner -- I'm not

16  sure how you pronounce it -- for evaluation, and

17  that he cleared him to work, and then it says:  I

18  spoke with Dr. T, and he stated he didn't complete

19  exam.  He stated he would not pay for the expense.

20               So is that that you would not pay for

21  that -- or patient stated that he would not pay

22  for the expense.  That's the expense for that

23  fitness for work evaluation?

24          A.   Yeah, but he gave me an initial test.

25  He gave me a test, and I took a test in his

75

```
 1   office.
 2         Q.    And then he says, when he refers to
 3   this he could not pay for the exam, it says:   I
 4   stated that this was the only way to return to
 5   work.  Did you understand that having that fitness
 6   evaluation was the only way to return to Boeing?
 7         A.    No.
 8         Q.    You didn't?
 9         A.    No.
10         Q.    Do you recall Dr. Burke telling you:
11   I stated that this was the only way you could get
12   back to work, to have that evaluation?
13         A.    No, no.  Like I say, Dr. Resa Mason,
14   we was following her orders.  I mean, Dr. Burke
15   and them, they can't tell me what I need to go
16   back to work, I don't think, because I need to do
17   what Boeing says to come back to work.
18         Q.    And Dr. Mason was saying you needed
19   that fitness evaluation.
20         A.    I guess in the end, she did, I mean,
21   but at that point, who's going to pay for it?
22               (DFT. EXH. 11, 1/14/13 Clinician Notes
23   of Dr. Burke [SBH_000001], were marked for
24   identification.)
25   BY MS. BLACKBURN:
```

1   this, and I'm going to give you a call about a

2   week later.  He gave me a phone call about a week

3   later, and he just said I was terminated.  That's

4   the end of the story.

5          Q.   Did he tell you why you were

6   terminated?

7          A.   Yeah.  Well, he explained that I

8   missed too many days out of work.  I said:  Well,

9   I mean, I'm sitting here waiting on medical

10  clearance to come back to work.  I said:  I got

11  vacation time.  I said:  It wouldn't have been no

12  problem for me to use two or three days of my

13  vacation time to cover this time for me to get

14  back to work, but I'm thinking that the paperwork

15  was cleared for me to be out to that date, and on

16  that date that I thought I was cleared, he said

17  that I was terminated, so --

18         Q.   Did you understand you were cleared,

19  and we're going to look at some of Aetna's

20  documents, but through January 13th?

21         A.   Yeah, January 13th or the 14th, I

22  think, something like that, I mean, I supposed to

23  been cleared, but --

24         Q.   I believe January 13th -- your leave

25  was through January 13th, and January 14th, you

82

```
 1   were expected to be back to work, unless you

 2   submitted some additional requests or paperwork.

 3        A.   Right, right.

 4        Q.   Was that your understanding?

 5        A.   Yeah, that's my understanding.

 6        Q.   When you talked to Michael, was it

 7   after January 13th or 14th?

 8        A.   I think it was.

 9        Q.   Was it in January?

10        A.   But it was in January.

11        Q.   But the deadline for submitting the

12   paperwork had already passed?

13        A.   I think so.

14        Q.   Did he tell you anything about you

15   didn't get the paperwork in, so your employment's

16   been terminated?

17        A.   No.  He didn't explain -- he didn't

18   explain to me the reason why.  I'm saying:  Hey, I

19   got almost 70 hours of vacation time here, I mean,

20   come on, three days.

21        Q.   Now, let me ask you this:  You

22   initially took Family and Medical Leave Act leave,

23   correct?

24        A.   Correct.

25        Q.   And did you understand that was 12
```

83

1  weeks of leave under the Family and Medical Leave

2  Act?

3          A.    Yeah, yeah, yeah.

4          Q.    So when you went out in August of

5  2012, the family and medical leave ran for 12

6  weeks?

7          A.    Right.

8          Q.    And then following that, you were out

9  on additional leave, but it wasn't family and

10  medical leave.  Was that your understanding?

11          A.    Yes.

12          Q.    So you had exhausted all of your FMLA

13  leave?

14          A.    Yes.

15          Q.    And then you were given additional

16  leave through Aetna after that?

17          A.    But the question that I had the whole

18  time I was out on leave, I never receive any pay.

19  I was approved for time out, but I never receive

20  any pay.

21          Q.    Right.  Did you understand that FMLA

22  leave was unpaid?

23          A.    No.

24          Q.    And then after the FMLA pay leave, you

25  were out on additional leave with Aetna,

Quattlebaum, Richard v                                      Richard Quattlebaum
Boeing Company                                                      July 08, 2015

85

```
 1   and stating whether there was any documentation or

 2   deadline that you had?

 3        A.   Yes.

 4        Q.   So this particular letter, for

 5   example, it says:  Dear Mr. Quattlebaum, your

 6   action is required, and it then refers to your

 7   claim for disability?

 8        A.   Yeah, but it's not really my action;

 9   it's my provider action.  Well, their provider --

10   they got these providers in their network.  These

11   are doctors they referred me to see.

12        Q.   Who, that Boeing did?

13        A.   Yes.

14        Q.   Who was that?

15        A.   Providers.  I mean, they give you a

16   list of providers that's in the network.

17        Q.   But you understood, didn't you, that

18   it was your responsibility to get the paperwork

19   back to Aetna?

20        A.   Yes.

21        Q.   And this particular letter shows your

22   last date of work is 8/21/12?

23        A.   Yes.

24        Q.   That was the last date you worked at

25   Boeing?
```

86

1      A.    Yes.

2      Q.    Did you ever come back into the

3  facility at all following August of 2012?

4      A.    No.

5      Q.    You never had any meetings at Boeing

6  or came back to Boeing for anything?

7      A.    The closest -- I was not allowed on

8  the premises.  The closest I got back to the

9  company was I was at the visitor center when I met

10  with Dr. Resa Mason.

11      Q.    When did that occur?

12      A.    That had occurred back on that

13  Thursday you said that she had that -- yes, that

14  two --

15      Q.    January of 2013?

16      A.    Yes, yes.  That's the date -- that's

17  the last time I been on the Boeing property was

18  when I met with her at the visitor center, because

19  I was not allowed on the premises, honestly.

20            (DFT. EXH. 14, Letters to Deponent

21  from Aetna [AETNA 000307 to -11, 000044 to -47,

22  000051 to -57, 000312 to -15, 000149, 000061,

23  000062, 00064, 000065, 000067, 000068, 000072 to

24  -78, 000080, 000083 to -89], were marked for

25  identification.)

88

1   events and leave section.  This looks like

2   additional information on just how to complete

3   your leave, and this was sent to you December 3rd,

4   2012.  It's got a behavioral clinician statement

5   attached.  Does that look familiar?

6        A.   Yes.

7             (DFT. EXH. 16, 12/14/12 Letter to

8   Deponent from Aetna [AETNA 000317], was marked for

9   identification.)

10  BY MS. BLACKBURN:

11       Q.   Then the next exhibit, which is

12  Exhibit 16, from Aetna, this letter states:  Based

13  on Aetna's review of the medical information

14  submitted with your claim, we did not find that it

15  sufficiently documented your level of impairment

16  preventing your ability to work, and then it goes

17  down to the next paragraph and says:  Aetna must

18  have all the requested clinical information prior

19  to 1/14/2013.

20            Do you recall getting this letter?

21       A.   Yes, and I gave it to Dr. Burke.  This

22  is the link between Aetna and Dr. Burke, and I'm

23  caught in the middle here.

24            (DFT. EXH. 17, 12/17/12 Letter to

25  Deponent from Aetna [AETNA 000095 to -96], was

90

```
 1   information, and this says short-term disability,

 2   so at this point in time, you're on short-term

 3   disability leave, correct?

 4        A.    Correct, yes.

 5        Q.    Your FMLA leave had expired or run

 6   out.  You had exhausted all of it back in 2012?

 7        A.    Right.

 8        Q.    And it says in the second paragraph:

 9   Aetna must have all the requested clinical

10   information prior to January 14th, 2013.  If we do

11   not receive the information requested, your claim

12   may be denied for insufficient clinical

13   information.

14             Were you aware that was Aetna's

15   position, they needed this information by

16   January 14, 2013?

17        A.    Yes.  Like I say, I'm caught between

18   Aetna and the provider, Dr. Burke.  Dr. Burke, I

19   got to have this paperwork.  He reading the same

20   thing I'm reading.  Now what am I to do?  Give the

21   paperwork to Dr. Burke and pray to God that he get

22   it out on time, that's all I can do.

23             You know, I'm not denying any of this.

24   I mean, your provider have to be in link with

25   everything else, and ain't nothing I can do.  I
```

91

```
1   can just -- I know Aetna say that I have to, but

2   it's not really up to me.  It's up to the provider

3   to get the letters back out on time.  It got very

4   frustrating.

5               (DFT. EXH. 20, Letters to Deponent

6   from Aetna [AETNA 000105, 000106, 000318, 000319,

7   and 000107], were marked for identification.)

8   BY MS. BLACKBURN:

9        Q.   These are the last three letters that

10  I'm going to show you from Aetna, Defendant's

11  Exhibit 20, and do you recall receiving these

12  letters?

13       A.   Yes.

14       Q.   Now, this last letter that's part of

15  Exhibit 20, which is dated 1/15/2013, that is the

16  letter that states your benefits have been denied.

17  Do you recall receiving that?

18       A.   Yes.

19       Q.   This states that on December 28th,

20  2012, your short-term disability claim was

21  suspended to allow for the submission of requested

22  clinical form from your provider, Dr. Burke.  The

23  clinical information was requested from Dr. Burke

24  via fax on 12/21/12.  The clinical was due no

25  later than 1/14/2013.  As of 1/14/2013, the
```

112

1  he was my HR representative.

2       Q.   And then when did she call you back

3  and tell you Michael would call you?

4       A.   That Thursday after she had a meeting

5  with Michael.

6       Q.   And she said Michael would call you,

7  and then when did Michael call you?

8       A.   Michael called me about a week later.

9       Q.   And told you what, that you were

10 terminated?

11      A.   I was terminated.

12      Q.   Now, when he called you, was it after

13 January 14th, 2013?

14      A.   I think so.

15      Q.   So January 14th, 2013, came and went,

16 and you did not get in any paperwork to Aetna,

17 right?

18      A.   No.

19      Q.   And you didn't come back to work?

20      A.   Right.

21      Q.   Mr. Quattlebaum, there's some notes

22 from Value Options, which is Resa Mason, produced

23 in the case, and just for reference, this is Bates

24 No. VO42.  And on December 7th, 2012, she said she

25 spoke with you and informed you of the